**BAYOU BOTTLING, INC.**

v.

**DR. PEPPER COMPANY and Coca-Cola Bottling Co. of Lake Charles, Inc.**

No. 790253.

United States District Court,
W. D. Louisiana,
Lake Charles Division.

July 15, 1982.

 

539 F.Supp. 867, 81-5929 TJH (C.D.Cal. April 12, 1982).

George P. Kersten and E. Campion Kersten, Kersten & McKinnon, Milwaukee, Wis., A. J. Gray, Camp, Carmouche, Palmer, Barsh & Hunter, Lake Charles, La., for plaintiff.

· William E. Shaddock and Robert W. Clements, Bernard H. McLaughlin, Jr., Stockwell, Sievert, Viccellio, Clements & Shaddock, J. L. Cox and James E. Williams, Woodley, Barnett, Cox, Williams & Fenet, Lake Charles, La., Morris Harrell and Marshall M. Searcy, Rain, Harrell, Emery, Young & Doke, Dallas, Tex., for defendants.

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

VERON, District Judge.

The plaintiff in this case, Bayou Bottling, Inc., (Bayou) has brought suit against defendants, Dr Pepper Company, (Dr Pepper) and Coca-Cola Bottling Co. of Lake Charles, Inc., (LCC), pursuant to §§ 4 and 16 of the Clayton Act (15 U.S.C. Sections 15, 26), charging the defendants with violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and Section 7 of the Clayton Act (15 U.S.C. § 18) in the amount of $45,-000,000.00, as well as court-ordered divestiture under 15 U.S.C. § 26. Following extensive discovery by both sides, the defendants have filed this motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56(c), contending that there is no genuine issue as to any material fact, and that the defendants are entitled to judgment as a matter of law. After hearing oral argument on this motion on April 29, 1982, the court took the matter under advisement and requested the submission by the parties of proposed findings of fact and conclusions of law. Having painstakingly considered the reams of memoranda submitted by the parties, in addition to the sometimes confusing but always artful argument of the distinguished counsel in this case, the court is now ready to rule.

This case is somewhat unusual, in that the defendants, hoping to once and for all slay the behemoth which this lawsuit has come to resemble, have chosen to concede many of the facts alleged by the plaintiff, for purposes of this motion only. Should the motion be denied, either in whole or in part, many (if not most) of the proposed findings of fact submitted by the plaintiff would become the subject of vehement dispute at trial. However, in urging their right to summary judgment, the defendants have assumed the position that Bayou Bottling cannot be entitled to judgment as a matter of law, even if all the facts alleged by the plaintiff were true.

The facts giving rise to this case had their genesis more than seven years ago, when the hands of time laid their steely grip on Mr. Lloyd Wilcox. Wilcox, owner of the local Dr Pepper bottling plant, was approaching retirement age and had decided to sell his operation. Two prospective buyers, LCC and Bayou, were waiting eagerly in the wings. The following facts relative to the events which later transpired are uncontested.

## UNCONTESTED FACTS

1. *The parties*: Plaintiff, Bayou, is a Louisiana corporation with its principal place of business in Jennings, Louisiana. Bayou is in the business of wholesaling and distributing soft drinks in the Lake Charles/Jennings area. Bayou carries several soft drink brands, of which the two biggest sell-

ers are Pepsi-Cola and Seven-Up.[1] Bayou is now the sole owner (since 1975) of Central Bottling Corporation, which produces the bottled soft drinks distributed by Bayou. Bayou also ownes six percent of the stock of Coastal Canning Corporation, a cooperative of Pepsi bottlers which produces Bayou's canned soft drinks. The current owners of Bayou purchased the business in December of 1976 for the price of $300,000.00, to be paid over a ten-year period. Bayou does business in the Western District of Louisiana.

Defendant Dr Pepper is a Colorado corporation with its principal place of business in Dallas, Texas. Dr Pepper is in the business of manufacturing soft drink "concentrate" for Dr Pepper and Sugar Free Dr Pepper soft drinks. Dr Pepper distributes its product by means of giving licenses, or franchises, to local bottlers, who use the concentrate in the manufacture of the finished product. Local bottlers set prices and determine marketing strategy, and are free to sell other brands, provided they are not classified as "imitators" of Dr Pepper. Dr Pepper does business in the Western District of Louisiana.

Defendant LCC is a Louisiana corporation with its principal place of business in Lake Charles, Louisiana. LCC, a licensee of the Coca-Cola Company and, since 1976, a licensee of defendant Dr Pepper, produces and sells several soft drink brands in its franchise area.[2] LCC does business in the Western District of Louisiana.

2. *Relevant product and geographic markets*: For purposes of this motion, the parties agree that the relevant product market is that of "soft drinks"[3], and that the relevant geographic market is the area of southwest Louisiana encompassed by LCC's Dr Pepper franchise.

3. *Nature of the industry*: The soft drink industry makes extensive use of what is known as the franchise system. The captains of the industry are the manufacturers of the different flavor extracts which are also referred to as "syrups" or "concentrates." For example, the Coca-Cola Company, PepsiCo, Inc., Seven-Up Company and Dr Pepper license the use of their product names and sell their flavor extracts to bottlers under franchise agreements which give the franchisee the exclusive right to wholesale the soft drink in packaged form within a specific geographic area. The flavor extracts are also sold in fountain syrup form. Two of the parties in this case, LCC and Bayou, occupy the position of wholesalers, and they compete against each other, and with private label and warehouse brands, for sales to retailers.[4] Once sold to retailers, all brands compete against each other at the "shelf" level for consumer acceptance.

The parties agree that the wholesaling of soft drinks is a "high volume" operation. That is, costs of production and distribution

---

1. Other brands Bayou sells are Diet Pepsi, Pepsi Lite, Mountain Dew, Sugar Free Seven-Up, Lipton's Iced Tea, Lipton's Diet Iced Tea, Nesbit Strawberry, NuGrape, Delaware Punch, Dad's Rootbeer, Sunkist Orange, Royale Chocolate, and Country Time Lemonade. In addition, Bayou also sells Dr Pepper and other products in fountain syrup form.

2. LCC sells Coca-Cola, Sprite, TAB, Fanta flavors, Fresca, Dr Pepper, Sugar Free Dr Pepper, Welch's flavors, Barq's Rootbeer and Nestea Iced Tea.

3. For purposes of this motion, soft drinks are defined as non-alcoholic, non-dairy beverages for human consumption, which are manufactured by addition of a flavored extract to water (usually carbonated), and purchased by the retail customer in consumable form, predominately packaged in bottles or cans but also dispensed in non-packaged form.

4. "Private labels" are soft drinks sold by grocery chains under their own trade name or the trade name of the organization from which the retail grocer purchases. The soft drinks are manufactured by the grocery chains themselves or by contract bottlers or canners. Some of the better known private labels include Cragmont (Safeway), Chek (Winn-Dixie), Gayla (Topco), Yukon (A&P), 7–11 (Southland) and Big-K (Kroger). "Warehouse brands" are soft drinks that are sold through regional warehouses by the manufacturer and which bypass the more common method whereby the concentrate manufacturer sells to a bottler who manufactures the finished product and sells to retail outlets in his local area. The best known warehouse brand is Shasta.

may be reduced by a higher volume of output. Profits are increased by the "economies of scale" resulting from reduction of unit cost by increasing output without a comparable increase in production and distribution expenses.

It is a common practice for a wholesaler to hold franchises from more than one nationally advertised brand. Dr Pepper is, comparatively speaking, a smaller concentrate manufacturer than, for example, Coca-Cola or PepsiCo. In 1978, no bottling company in the United States produced only Dr Pepper, and only 30 bottling plants produced Dr Pepper as their primary product. As a result, Dr Pepper must seek out local bottlers of other brands who are willing to take on their product.

4. *The scenario prior to the sale of the Wilcox franchise*: In 1974, there were two Dr Pepper bottlers in southwest Louisiana: one owned by Mr. Clyde Johnson in Lafayette, the other owned by Wilcox in Lake Charles. Both men were approaching retirement age and, by February of 1975, both had discussed the possibility of selling their franchises with Mr. Donald L. Antle, Vice-President, in charge of franchises for Dr Pepper. The parties agree that Wilcox was not, at this time, aggressively marketing his product, and that his plant was in need of substantial capital improvements. Nonetheless, there were two parties that were extremely interested in the acquisition of this ailing business, both of whom felt that they could breathe new life into it. These two prospective buyers were, of course, LCC and Bayou.

Wilcox and Johnson negotiated with both LCC and Bayou relative to the sale of their respective franchises, and it is also conceded that Mr. Antle took an active role in these negotiations. Both LCC and Bayou were interested in obtaining the Wilcox operation so as to increase their cost efficiencies, thereby bringing a concomitant increase in profits. As for Dr Pepper, the parties agree that this company was interested in having the franchises sold to the local Coca-Cola bottler.

Bayou's board of directors adopted a resolution formally declaring the corporation's intention to acquire the Wilcox operation. Bayou made an oral agreement with Wilcox to buy his business for a price of $1 million on April 23, 1975. Further discussions were had early in the day on April 25, 1975, but later that day Antle, Wilcox, and representatives of LCC confected a binding written agreement for the sale of Wilcox's business to LCC for $1 million. Although Antle preferred that Johnson also sell his franchise to the Coca-Cola bottler for the Lafayette area, Johnson had already accepted $100,000 in earnest money from the Lafayette Seven-Up/Pepsi bottler, Central (an affiliate of Bayou), and Johnson sold his business to them. The franchise was later assigned to Acadiana Bottling Company and approved by Dr Pepper.

As stated earlier, the policy of Dr Pepper favored the combination of Dr Pepper with Coca-Cola bottlers in southern Louisiana, and Mr. Antle encouraged both Wilcox and Johnson to sell their respective franchises to the Coca-Cola bottlers in their area. In the case of Wilcox's franchise, Antle had his wish; in the case of Johnson's franchise, he did not. In other words, the defendants concede for purposes of this motion that Dr Pepper encouraged Wilcox to sell to LCC and not to Bayou. However, the court finds that the plaintiff's proposed finding of fact that there was a conspiracy between Dr Pepper and LCC to prevent Bayou from acquiring the Wilcox franchise, directed at restraint of competition, to be merely conclusionary in nature. It is however, an undisputed fact that LCC's acquisition of the Wilcox franchise foreclosed Bayou from obtaining a Dr Pepper franchise for the same marketing area.

5. *Effects of LCC's acquisition of the Dr Pepper franchise on the relevant market*:

a. Bayou instituted a lawsuit in the Fourteenth Judicial District Court of Calcasieu Parish on May 23, 1975, seeking specific performance of the alleged contract of sale entered into with Wilcox on April 23, 1975. Since the pleadings admitted that no written agreement had been confected (and,

indeed, counsel for the plaintiff admitted in oral argument that many of the terms of the sale were yet to be resolved), the state court dismissed Bayou's claim on September 26, 1975, finding that it was barred by the Louisiana Statute of Frauds. No appeal was taken, but LCC's acquisition of the franchise was held in abeyance pending the outcome of the litigation, until June 3, 1976.

b. For purposes of this motion, the defendants concede the validity of certain market share figures propounded by the plaintiff. According to these figures, Wilcox's franchise enjoyed a 30% market share prior to the purchase by LCC; LCC enjoyed a market share of some 45–50%; Bayou claimed a mere 20% of the market, and all other remaining brands accounted for less than 5% of the market. Therefore, after the purchase of Wilcox's business, LCC's market share was between 75–80%, and Bayou's was 20%.

c. *Vending machines and coolers*: Defendants also concede for purposes of this motion that, subsequent to the acquisition, LCC outnumbered Bayou in vending machine sales by a ratio of 5 to 1. (Bayou's figures indicate that Bayou has 523 vending machines and 167 coolers, and that LCC has 2891 vending machines and 521 coolers.) It is also undisputed for our purposes today that LCC does not permit store owners to place Bayou's products in LCC-owned vending machines and coolers, and that LCC provides free maintenance service for store owners only when those machines are stocked exclusively with LCC products. Bayou also provides free vending machines to store owners.

d. *Shelf space*: The shelf space allocated to the different soft drink manufacturers is determined, ultimately, by the retail store owner or manager. However, soft drink suppliers are allowed to arrange their products themselves, subject only to the supervision of the store operator, and space is generally accorded each supplier based on

the proportionate market share of their product. Therefore, it is conceded that LCC occupies 75–80% of the available shelf space in retail stores, and that Bayou obtains 20%.

e. *The Pepsi Challenge*: Both Bayou and LCC sell their soft drink products in a large number of packages, including 12-ounce cans and returnable and nonreturnable bottles in the following sizes: 6½-ounce, 10-ounce, 16-ounce, 28-ounce, 32-ounce and 48-ounce. In 1973, Bayou Bottling was the first in the Lake Charles area to introduce the 32-ounce returnable/resealable bottle, offering a discount on such packages of Pepsi and Seven-Up of $0.50 off its normal wholesale price. In November of 1974 (prior to the acquisition by LCC of the Wilcox operation), defendant LCC introduced its own 32-ounce returnable/resealable package of its corresponding products, Coca-Cola and Sprite. Beginning in June, 1975, LCC offered these products at a discount of $1.00 per case in the Lake Charles marketing area. This discount remained in effect until January 3, 1977.[5]

f. *Mr. PiBB*: The concentrate for Mr. PiBB is manufactured by The Coca-Cola Company. In an attempt to obtain a franchise for a soft drink in the same "flavor category" as Dr Pepper, Bayou repeatedly applied for a franchise to distribute Mr. PiBB. The Coca-Cola Company refused Bayou's requests, on the ground that such franchises were only granted to Coca-Cola bottlers. LCC does not market Mr. PiBB in the Lake Charles area, because of its agreement with Dr Pepper not to sell another soft drink in the same flavor category as Dr Pepper. (Mr. PiBB is marketed by LCC in the Lafayette area, where they do not have a Dr Pepper franchise.) The national Coca-Cola Company is not a party to this suit.

g. *Dr. Nut*: In 1976, having been unable to obtain a franchise for either Dr Pepper or Mr. PiBB, Bayou's owners attempted to develop and sell their own en-

---

**5.** On a full line basis, LCC's average total costs per case of soft drinks sold in its Lake Charles and Jennings marketing areas were $2.36 in 1974, $2.79 in 1975, $2.73 in 1976 and $2.87 in

1977. LCC's average revenues per case in those areas were $2.62 in 1974, $3.18 in 1975, $3.23 in 1976 and $3.30 in 1977.

trant in this flavor category: Dr. Nut. In April of 1978, Dr. Nut, Inc. reapplied for federal trademark registration. Dr. Nut, Inc., then filed a complaint in federal district court for the Western District of Louisiana for damages incurred as a result of this opposition. The case was settled and dismissed. In 1981, sales of Dr. Nut were discontinued, and Dr. Nut, Inc. is now in the process of being wound up.

Based on the above undisputed facts, the court now makes the following

## CONCLUSIONS OF LAW

1. *Propriety of granting the motion for summary judgment*:

The plaintiff in this case has offered argument in support of the proposition that summary judgment is particularly inappropriate in antitrust cases. However, as the plaintiff quite correctly states in its proposed findings of fact and conclusions of law:

> Summary judgment may be granted in antitrust cases, as in other cases, where there is no genuine issue of material fact and it is clear that the moving party is entitled to judgment as a matter of law. F.R.Civ.P. 56(c); *Aladdin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107, 1111–1112 (5th Cir. 1979). Nevertheless, as pointed out in II Areeda & Truner, *Antitrust Law*, § 316 at 58:

> > Any discussion of summary judgment must, of course, recognize that it is often inappropriate. The Supreme Court said that it should be used sparingly in antitrust cases. And it is not a substitute for trial. All ambiguities and all reasonable inferences, it is frequently said, must be resolved in favor of the party against whom summary judgment is sought. And it is also said that the claimant need not, at the outset, submit probative evidence in support of his position. The moving party has the burden of showing on the basis of admissible evidence, from persons with personal knowledge of the facts, that there is no genuine issue for trial as to any material fact.

The authors go on to say that mere allegations in a complaint or defensive pleading are insufficient to resist summary judgment and that the party opposing the motion must offer probative evidence to support his claim.

In a recent case, *Southway Theatres, Inc. v. Georgia Theatre Co.*, 672 F.2d 485 (5th Cir. 1982), the Fifth Circuit provided an informative discussion on the standard for summary judgment in antitrust cases. It is proper for the court to make some assessment of the inferences that the plaintiff wishes to be drawn from the circumstantial evidence.

The party opposing a motion for summary judgment is entitled to the benefit only of *reasonable* inferences that may be drawn in its favor... Some scrutiny is thus required to determine whether the facts are susceptible of the interpretation which Southway (the plaintiff) seeks to give them in light of the defendants' evidence contradicting Southway's allegations ....

This court has previously described the proper extent of a court's assessment of the inferences in this matter:

> insofar as any weighing of any inferences from given facts is permissible, the task of the court is not to weigh these against each other, but rather to cull the universe of possible inferences from facts established by weighing each against the abstract standard of reasonableness, casting aside those which do not meet it and focusing solely on those which do.

(citations omitted)

See also, *In Re Municipal Bond Reporting Antitrust Lit.*, 672 F.2d 436 (5th Cir. 1982), and *Carlson Mach. Tools, Inc. v. American Tool, Inc.*, 678 F.2d 1253 (5th Cir. 1982).

 This court has long been of the opinion that summary judgment should be used sparingly *in all cases*, and it is only with great caution and much soul-searching that such motions will be granted by this court.

2. *The court's analysis*: The court is now of the opinion that the lengthy history and

heated debate engendered by this lawsuit are due to the fact that the opposing parties have diametrically opposed theories of this case. On the one hand, the plaintiffs are of the firm belief that their allegations, if proved, establish violations of the antitrust laws, and that they are therefore entitled to compensation for any and all injuries which would not have been suffered but for such alleged violations. The defendants, on the other hand, theorize that the antitrust laws are designed to afford redress for only certain kinds of injury, and, although the fortunes of plaintiff's business may have suffered through the success of defendant's operation, the antitrust laws afford plaintiff no right to relief, let alone relief in the magnanimous form of treble damages. In an effort to answer the plaintiff cries of both sides, the court will attempt to examine each allegation of anticompetitive conduct, determine its merit, and then address the question of whether the kind of injury alleged to flow from such conduct is within the protection of the antitrust laws. The court is by no means so naive as to believe that both sides will be satisfied with the result of its analysis, but it is hoped that plaintiff and defendants will agree that the court has adequately considered, if not concurred with, their reasoning.

3. *The accumulation of franchises*: The major thrust of the plaintiff's argument seems to be that the acquisition by LCC of the Wilcox Dr Pepper franchise made LCC a monopolist in the soft drink industry in the Lake Charles marketing area, as evidenced by certain anticompetitive effects on such market. Bayou claims that the merger of the Dr Pepper franchise with LCC was anticompetitive because, had Bayou, rather than LCC acquired the franchise, the market shares of the two Lake Charles wholesalers would have been nearly equal, thereby fostering competition.

The accumulation of several exclusive franchises does not necessarily operate so as to restrain trade. The defendants suggest an analogy between this case and two Third Circuit decisions: *Lawlor v. National Screen Service Corporation*, 270 F.2d 146 (3rd Cir. 1959), and *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139 (3rd Cir. 1981).

In *Lawlor*, the plaintiff and the defendant were in the business of distributing advertising accessories to movie theatres. The defendant had acquired exclusive franchise agreements with the eight leading motion picture studios, giving them the sole distribution rights for all films produced by these studios. The court found no antitrust violation. The plaintiffs were free to compete for the acquisition of the exclusive franchises, when they became available, and there was no restraint of trade or reduction in supply due to the aggregation of several franchises by the defendant.

Similarly, in the *Fleer* case, the court found no unreasonable restraint of trade. The defendant Topps had an agreement with the Major League Baseball Players Association giving them the exclusive right to distribute bubble gum with baseball cards depicting the various players. The court discussed the *Lawlor* case, above, noting:

... This court held that an accumulation of exclusive licenses is not a violation of the Sherman Act because a rival film accessory distributor could always compete against National Screen for subsequent contracts with motion picture producers. Similarly, in our case, Fleer or any other trading card manufacturer, may compete with Topps for minor league players or even persuade the present major league players not to renew their Topps' contracts.

In keeping with this line of reasoning, the court found no antitrust violation because competition in the relevant product market (which the court identified as "pocket size pictures of active major league baseball players, sold alone or in combination with a low cost premium, at a price of 15 to 50 cents") was not foreclosed.

However, these two cases involve a characteristic not present in the instant lawsuit. In both cases, the licenses involved products which *do not compete against each other.* Hence their accumulation does

not prevent a rival manufacturer from entering the market and does not operate as a restraint of trade.

658 F.2d at 150. (emphasis added)

For example, each motion picture involved in the *Lawlor* case used different accessories, not useful for the promotion of other films; each player's trading card in the *Fleer* case was distinct from every other's. A poster advertising Gone With the Wind does not compete with one advertising Star Wars, and a Ron Guidry baseball card does not compete with a Reggie Jackson baseball card. Here, however, Dr Pepper, Coca-Cola, Sprite, Pepsi, and 7-Up all compete against each other for the consumer's taste buds. Therefore, the court feels that the reasoning of these two cases is not directly analogous to our situation.

Of much greater interest to the court is the case of *Top-All Varieties, Inc. v. Hallmark Cards, Inc.*, 301 F.Supp. 703 (S.D.N.Y. 1969). The plaintiff in that case owned a chain of retail stores, including one about to open in Tarrytown, N. Y. Hallmark entered into an agreement with another retail store in Tarrytown (Stationer's), to the effect that only Stationer's would be allowed to handle the Hallmark line. The court dismissed plaintiff's case for failure to state a claim upon which relief could be granted, stating that:

> While Hallmark is alleged to be the largest producer of greeting cards in the U. S., the complaint recognizes that there are other competing manufacturers who can supply Top-All with such products. It is alleged that Hallmark cards are the leading brand of greeting cards and that customers wishing to purchase them will take their business only to a store handling Hallmark products. But this does not make the exclusive distributorship invidious or unlawful.
> *There is no claim here that there is not a substantial market for the sale of cards produced by Hallmark's competitors ... Thus the plaintiff does not allege that interbrand competition is affected in any way by the Hallmark exclusive distributorship arrangements with Stationer's.*

(emphasis added)

The court went on to distinguish the case at bar from that of *Klor's v. Broadway-Hale Stores*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

> The *Klor's* case involved a conspiracy between a large number of nationally known appliance manufacturers and distributors and Broadway-Hale Stores, a retail distributor of appliances and a competitor of Klor's, to refuse to sell to Klor's or to sell only at discriminatory prices. There are indications that Broadway-Hale extracted the agreement by use of its monopoly buying power. Thus the *Klor's* case involved a predatory conspiracy with both horizontal and vertical elements directed at a single competitor with the purpose of driving that competitor from the field by foreclosing all sources of supply.

301 F.Supp. at 705.

The conclusion of the court, therefore, is that the agreement between Dr Pepper and LCC to join hands against Bayou was not, standing alone, in restraint of trade or anticompetitive in effect. Though Bayou does not now compete on an equal footing with LCC, they do nonetheless compete. The retail store owner (and the consumer) is not hampered in his freedom to choose between LCC's products and Bayou's by the bare fact that LCC holds the Dr Pepper franchise. We will look, therefore, to the plaintiff's allegations of anticompetitive effects of the accumulation of the franchises, for the mere fact that they have been accumulated is insufficient to establish the plaintiff's right to recover.

4. *Anticompetitive effects*

a. In its first allegation of anticompetitive effects of the acquisition, the plaintiff cites:

> Foreclosure from marketing Dr Pepper, with resulting loss of the cost efficiencies Bayou Bottling would have derived from increased volume, loss of profit from increased past and future sales, including loss of sales of Dr Pepper and loss of increased sales of its other brands due to the improved ability to price them more

competitively. As to future sales, Bayou Bottling's claim may be expressed either in terms of discounted present value or loss of present capital value—i.e., difference in value of the business as it is versus what it would have been had the antitrust violations not occurred.

The question is whether Bayou's loss of business and cost efficiency due to LCC's acquisition of the Wilcox franchise indicates an anticompetitive effect of such acquisition. The defendants submit that this and other allegations of injury fail the test of *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Since the *Brunswick* case is so important to our decision today, the court finds it expedient to discuss it in some detail.

The defendant in that case was one of the two largest manufacturers of bowling equipment in the United States; the plaintiffs were three bowling centers owned by Treadway Companies, Inc. To combat increasing financial difficulties caused by a decline in the bowling industry, the defendant instituted the practice of acquiring operating defaulting bowling centers when their equipment could not be resold and a positive cash flow could be expected from operating the centers. The size of the defendant's operation increased, until they had over five times as many centers as their next largest competitor. The plaintiffs claimed that the acquisitions in their market areas might substantially lessen competition or tend to create a monopoly in violation of § 7 of the Clayton Act, 15 U.S.C. § 18. Damages were sought pursuant to § 4, 15 U.S.C. § 15, for three times "the reasonably expectable profits to be made (by respondent/plaintiffs) from the operation of their bowling centers." 429 U.S. at 481, 97 S.Ct. at 693.

The court stated the theory of the plaintiffs' case as follows:

To establish a Section 7 violation, respondents sought to prove that, because of its size, petitioner had the capacity to lessen competition in the markets it entered by driving smaller competitors out of business. To establish damages, respondents attempted to show that had petitioner allowed the defaulting centers to close, respondents' profits would have increased.

Intermeshing a statutory prohibition against acts that have a potential to cause certain harms with a damages action intended to remedy those harms is not without difficulty. Plainly, to recover damages respondents must prove more than that petitioner violated § 7, since such proof establishes only that injury may result. Respondents contend that the only additional element they need demonstrate is that they are in a worse position than they would have been had petitioner not committed those acts. The Court of Appeals agreed, holding compensable any loss "causally linked" to "the mere presence of the violator in the market." [*NBO Industries, Treadway Co., Inc. v. Brunswick Corp.*] 523 F.2d [262], at 272–273 [ (1975) ]. Because this holding divorces antitrust recovery from the purposes of the antitrust laws without a clear statutory command to do so, we cannot agree with it.

Every merger of two existing entities into one, whether lawful or unlawful, has the potential for producing economic readjustments that adversely affect some persons. But Congress has not condemned mergers on that account; it has condemned them only when they may produce anticompetitive effects. Yet under the Court of Appeals' holding, once a merger is found to violate § 7, all dislocations caused by the merger are actionable regardless of whether those dislocations have anything to do with the reason the merger was condemned. This holding would make § 4 recovery entirely fortuitous, and would authorize damages for losses which are of no concern to the antitrust laws.

Both of these consequences are well illustrated by the facts of this case. If the acquisitions here were unlawful, it is because they brought a "deep pocket" parent into a market of "pygmies." Yet

respondents' injury—the loss of income that would have accrued had the acquired centers gone bankrupt—bears no relationship to the size of either the acquiring company or its competitors. Respondents would have suffered the identical "loss" —but no compensable injury—had the acquired centers instead obtained refinancing or been purchased by "shallow pocket" parents, as the Court of Appeals itself acknowledged, 523 F.2d, at 279. Thus, respondents' injury was not of "the type that the statute was intended to forestall."

But, the antitrust laws are not merely indifferent to the injury claimed here. At base, respondents complain that by acquiring the failing centers petitioner preserved competition, thereby depriving respondents of the benefits of increased concentration. The damages respondents obtained are designed to provide them with the profits they would have realized had competition been reduced. The antitrust laws, however, were enacted for "the protection of competition, not competitors." It is inimical to the purposes of these laws to award damages for the type of injury claimed here.

Of course, Congress is free, if it desires to mandate damages awards for all dislocations caused by unlawful mergers despite the peculiar consequences of so doing. But because of these consequences, "we should insist upon a clear expression of a congressional purpose," before attributing such an intent to Congress. We can find no such expression in either the language or the legislative history of § 4. To the contrary, it is far from clear that the loss of windfall profits that would have accrued had the acquired centers failed even constitutes "injury" within the meaning of § 4. And it is quite clear that if respondents were injured, it was not "by reason of anything forbidden in the antitrust laws": while respondents' loss occurred "by reason of" the unlawful acquisitions, it did not occur "by reason

of" that which made the acquisitions unlawful.

We therefore hold that for plaintiffs to recover treble damages on account of § 7 violations, they must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause."

(citations omitted, footnotes omitted)

429 U.S. at 486–489, 97 S.Ct. at 696.[6]

■ *Brunswick*, therefore, established a bifurcated test for the allowance of damages in an antitrust action: 1) the injury must flow from that which makes the defendants' acts unlawful, *and* 2) the injury must be the type of injury that the antitrust laws were intended to prevent.

■ The plaintiff's first allegation of injury stems from its failure to acquire the Dr Pepper franchise. However, like the plaintiffs in the *Brunswick* case, Bayou would have suffered this injury no matter who acquired the franchise, or if it had not been sold at all. While no one denies that Bayou is in a less desirable position due to its inability to acquire Wilcox's business, this can only be described as a hazard of the marketplace, and not the type of injury the antitrust laws were designed to prevent. Neither facet of the *Brunswick* test is satisfied. First of all, Bayou's lost revenues do not flow from the fact that LCC holds such a large market share, but from the fact that they were unable to purchase the business in question. Secondly, these lost profits and cost efficiencies were not the type of injury the antitrust laws were designed to prevent. These laws were intended to pro-

6. It is with reluctance that the court has quoted so extensively from this case, but to have deleted a portion of the quotation would have resulted in failing to set forth a full explanation of the ruling in the case at bar.

tect competition, but to hold that this loss evidences an anticompetitive effect of the defendant's actions would be to protect competitors, not competition. And that we cannot do. *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1961).

b. Bayou's next allegation of antitrust injury is stated as follows:

> Foreclosure from marketing other drinks in the same flavor category: the nationally advertised and promoted Mr. PiBB, or in the alternative Dr. Nut, with resulting losses in cost efficiencies, volume, sales, profits and capital value similar to those in subparagraph (a), and its expenses incurred in attempting to promote Dr. Nut.

■ The court finds that this claim of anticompetitive injury can be resolved without resort to antitrust law. With respect to the inability to obtain a franchise for Mr. PiBB, suffice to say here that all parties admit that the decision to grant franchises for this product only to Coca-Cola bottlers is a unilateral decision of the national Coca-Cola Company, which is not a party to this suit. Further, although it is apparent to the court that the failure of the attempt to promote Dr. Nut was in no way attributable to any anticompetitive conduct by the parties to this lawsuit, the court is precluded from considering this question by the principle of res judicata, since Bayou and Dr Pepper have already resolved this matter by means of settlement.

■ c. Bayou further alleges antitrust injury in the following manner:

> Lost sales, volume and profits from vending machines and coolers, as a result of LCC's market dominance in respect to these and of LCC's acquisition of Dr Pepper, and of its enhanced power to exclude and actual exclusion of Bayou Bottling products from LCC-supplied vending machines and coolers, plus lost sales volume and profits generally as a result of the related effect on brand loyalty for Bayou Bottling's products vs. LCC's products.

"A monopolist may not take measures with the purpose of preventing effective competition; it may, however, aggressively compete in the marketplace." *Superturf, Inc. v. Monsanto Co.,* 660 F.2d 1275, 1280 (8th Cir. 1981).

These vending machines and coolers bear the trademark of the soft drink company that places them, and are used as a promotional tool by both LCC and Bayou. The fact that LCC excludes Bayou's products from its coolers cannot be said to be anticompetitive conduct. Rather the court views this as the expected result of healthy competition. This is the only reasonable inference. Even a monopolist is allowed to meet competition by promoting its own product.

Northeastern (the plaintiff) suggests that a monopolist's efforts in meeting competition are to be condemned unless they are intended to promote consumer welfare. While it is a fundamental tenet of antitrust law that customers will benefit from the salubrious effects of competition, a monopolist's right to compete is not limited to actions undertaken with an altruistic purpose. Even monopolists must be allowed to do as well as they can with their business.

*Northeastern Tel. Co. v. Am. Tel. & Tel. Co.,* 651 F.2d 76, 93 (2nd Cir. 1981), cert. denied, —— U.S. ——, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982), citing *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.,* 601 F.2d 48, 55 (2d Cir. 1979).

See also, *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir. 1979). In short, it cannot be said that the antitrust laws require LCC to assist Bayou in the promotion of their own product.

■ d. In their fourth allegation of antitrust damages, the plaintiff cites:

> Lost sales, volume and profits as a result of the LCC acquisition of Dr Pepper, its enhanced power and its exercise of that power in respect to shelf space, increased flexibility in promoting specific products on the shelf and related point of sale promotion.

Again, the allocation of shelf space by store managers in proportion to market share simply does not reflect an anticompetitive effect of the acquisition of the Dr Pepper franchise. The defendants have answered this charge with a simple, common-sense analysis of the question, which is of great appeal to the court:

> Plaintiff's allegation with regard to shelf space is that LCC obtains 75 to 80 percent of the shelf space at retail outlets while Bayou obtains only 20 percent. Since these figures correspond to what Plaintiff claims are the two companies' market shares, LCC's advantage in shelf space is precisely what would be expected from non-predatory competition. Moreover, Bayou concedes that that shelf space decisions are ultimately made by the store managers themselves. Thus, Bayou appears to be saying not only that it is entitled to more shelf space than its sales warrant, but that LCC should somehow compel store managers to give preference to its competitor's wares. The antitrust laws compel no such result.

e. The next antitrust injury alleged by plaintiff is:

> Lost sales, volume and profits as a result of LCC's predatory pricing and LCC's enhanced power to engage in predatory pricing due to its acquisition of Dr Pepper.

The court has carefully examined Bayou's claim of predatory pricing and has found it to be without merit. The court has first analyzed the facts concerning such claim as alleged by the plaintiff. First and foremost among them is the fact that the discounted 32-ounce returnable bottle was *first* introduced in the Lake Charles area by *Bayou*.

Bayou admitted to having great success with this package. In response to this "challenge" from the Pepsi bottler, LCC then introduced its own 32-ounce bottle at an even lower price.

It seems to the court that this response by LCC typifies the aim of the antitrust laws. The consumer reaps the benefit of lower prices when competitors vie for greater market shares in the age-old method of offering a comparable product at a lower cost. Plaintiff, on the other hand, contends that this pricing procedure was predatory in two respects: 1) that the effect of LCC's $1.00 per case discount was to put the price of these products below LCC's average variable cost; and 2) that the discount was discriminatory because it applied only in LCC's Lake Charles and Jennings marketing areas, not in its Lafayette marketing area.

 The court is compelled to agree with the defendants that where, as here, both LCC and Bayou sell a full and widely varied line of soft drinks, in all forms of packages, it is appropriate, in determining whether an item is sold below average variable cost, to look to the average variable cost of the *entire line* of products, and not just the sale of Coke and Sprite in 32-ounce bottles. The prohibition against predatory pricing is meant to insure that the defendant has not "sacrificed present revenues for the purpose of driving (a competitor) out of the market with the hope of recouping the losses through subsequent higher prices." *International Air Ind., Inc. v. American Excelsior Co.*, 517 F.2d 714, 723 (5th Cir. 1975), reh. and reh. in banc den. October 8, 1975. However, active competition, including price rivalry, is to be encouraged.[7]

---

7. That legal standard, however, must be applied with a practical understanding of business realities. Even legitimate price decreases will necessarily have a non-remunerative effect upon other firms in the market. These decreases will reduce competitors' profit margins and they may drive the inefficient firm out of business while the firm which originally reduced prices continues to make a profit. It is the very nature of competition that the vigorous, efficient firm will drive out less efficient firms. This is not proscribed by the antitrust laws. "Antitrust legislation is concerned primarily with the health of the competitive process, not with the individual competitor who must sink or swim in competitive enterprise." .... Thus we must exercise great care in differentiating between legitimate price competition and that "predatory pricing" which constitutes a restraint of trade. *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 855–56 (9th Cir. 1977); see also *A. H. Cox & Co., v. Star Machinery Co.*, 653 F.2d 1302, 1307 (9th Cir. 1981).

■ The court is well aware that the practice of fixing the price of certain items below cost as "loss leaders" serves the purpose of attracting customers and encourages the consumer to sample the product. This practice is readily distinguishable from that of a monopolist operating its business at a loss so as to drive a competitor from the marketplace, thereby enabling the monopolist to gouge the consumer with ever-higher prices, free from the restraints of competition.

The court adopts the reasoning of the Ninth Circuit in *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848 (9th Cir. 1977), cert. den. 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978), wherein the court stated:

> . . . The pricing of one size at a predatory level would not necessarily drive out rivals who were selling a full line, as is the case in this industry, unless this placed the overall price of the line at the predatory level. Yet there was no evidence that the entire line was so priced for the years in question.

570 F.2d at 856.

Since the plaintiff has not alleged that the defendant LCC sold its entire line of products below their average variable cost, and since the price cut came in response to a discount offered by Bayou, the court is of the opinion that the only reasonable inference which may be drawn from the undisputed facts is that there has been no predatory pricing, but rather that the consumer benefited (albeit at Bayou's expense) from LCC's attempt to regain the share of the market lost to Bayou.

■ In any event, the claim of predatory pricing cannot scale the hurdle erected by *Brunswick, supra.* The fact is that the so-called predatory pricing began more than a year previous to LCC's acquisition of the Wilcox franchise. Therefore, it cannot be said that any injury to Bayou "flowed" from an antitrust violation.

■ f. Bayou's final allegation of antitrust injury is phrased as follows:

Lost sales, volume, cost efficiencies, profit and ability to grow, market and promote existing and new products, due to the fact that Bayou Bottling must compete with a monopolist, particularly a monopolist which has a franchise extending into two marketing areas (both the Lake Charles marketing area and the Lafayette marketing area), has a "deep pocket" allowing it to spend whatever is necessary to counter any promotional activity Bayou Bottling may attempt, can afford the extra personnel to engage in various promotional activities and supply equipment to a degree with which Bayou Bottling cannot compete, and which has and exercises the power to perpetuate and exacerbate its large volume advantage and Bayou Bottling's corresponding unit cost disadvantage.

The court has scrutinized this allegation of injury and/or the anticompetitive effects of the Wilcox acquisition by LCC with a discerning eye. The gist of this (and the entirety of plaintiff's complaint) seems to be simple: LCC's gain is Bayou's loss. Bayou laments not only the fact that they were unable to buy the Dr Pepper franchise; but also the fact that the franchise was acquired by their arch rival—LCC. It is the opinion of the court that this quixotic tilt at the windmill of competition demonstrates that the plaintiff is seeking relief which the antitrust laws simply are not designed to provide.

It cannot be gainsaid that:

[f]rom the time of the seminal antitrust decision, *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), only reasonable restraints of trade have been held to be proscribed by the Sherman Act.

*Sports Center, Inc. v. Riddell, Inc.*, 673 F.2d 786 (5th Cir. 1982), citing *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

Bayou has failed to demonstrate to this court any facts which could give rise to a

reasonable inference that LCC's market dominance is the result of willful acquisition of monopoly power. Although it is unfortunate from Bayou's standpoint that there are more residents in the Lake Charles area who believe that "Coke is it" and/or choose to "be a Pepper" than those desirous of accepting the "Pepsi Challenge" or "feeling 7-Up," there has been no showing that the parties market shares are the product of price fixing and/or exclusion of competition by LCC, as opposed to a superior product and/or business acumen.

It is not the duty of this court to require store owners to accord greater shelf space to a less popular product, to force LCC to promote their competitor's wares in their own vending machines and coolers, to forbid the Dr Pepper company from encouraging alignment with the most efficient bottler willing to purchase their franchise, to dictate the policy of the national Coca-Cola Company in the granting of its franchises, to underwrite the excursions into the marketplace of new products (Dr. Nut), or to prohibit LCC from underselling its competitors. In short the court is not obliged, under the facts of this case, to engage in affirmative action. In each request, Bayou asks the court to protect a competitor, not competition.

■■■ We find the record to be devoid of evidence of intent to bring about a monopoly. Monopoly is the power to fix prices and exclude competition. *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Competition is alive and well in the Lake Charles soft drink industry; the consumer is given a wide range of choices in selecting his desired beverage. The court cannot force him to choose a brand for which Bayou holds the franchise. The fact is that Bayou possesses the same market share as they did prior to the acquisition.

"Legitimate competition cannot anchor an antitrust action." *In Re Municipal Bond Reporting Antitrust Litigation*, 672 F.2d 436 (5th Cir. 1982). Bayou would have suffered the same lost revenues and cost efficiencies no matter who acquired the Dr Pepper franchise. Bayou's injuries do not flow from the fact that LCC has a greater market share; they flow from the fact that competition has precluded Bayou from achieving the position they desire. This is not the type of injury that the antitrust laws were designed to prevent, even if a violation of such laws were shown.

Many of the cases cited by the plaintiff involve suits brought by the government to enjoin the merger of businesses on the ground that such merger might operate so as to restrain trade. However, this is a suit by a private plaintiff, and Section 4 of the Clayton Act is a *remedial* statute providing treble damages to any person "who shall be injured in his business or property by reason of anything in the antitrust laws." Therefore, the plaintiff must show actual injury attributable to something the antitrust laws were designed to prevent, as opposed to the burden in a Section 2 claim, which only requires a showing that such injury *might* result. *Brunswick* rejected the idea that mere violation of Section 7 of the Clayton Act gives rise to a damages claim under Section 4. *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 561–563, 101 S.Ct. 1923, 1926, 68 L.Ed.2d 442 (1980). Proof of antitrust injury is an essential element of the plaintiff's claim; absent such proof, plaintiff can claim no relief. There is no need to consider whether there were violations of the antitrust laws if there is no antitrust injury. *Purex Corp. v. Proctor & Gamble Co.*, 664 F.2d 1105 (9th Cir. 1981); *Cal. Computer Products v. Intern. Business Machines*, 613 F.2d 727 (9th Cir. 1979).[8]

---

8. Section 4 of the Clayton Act, 15 U.S.C. § 15, authorizing private antitrust suits for damages, provides in part:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor
. . . .

This statute confers standing to sue only upon those persons causally injured by antitrust violations. . . . Moreover, in order to prevail the plaintiff must prove not only injury causally linked to the asserted violation, but also that the injury is the type the antitrust laws were intended to prevent. . . . The plaintiff's burden

Since the court is able to dispose of this matter for the above stated reasons, the court finds it unnecessary to address the defendants' other defenses (particularly those which are peculiar to Dr Pepper alone), although the questions raised seem to the court to be meritorious.

In conclusion, therefore, the court finds that the defendants' motions must be granted for the reason that the plaintiff has failed to provide any evidence from which a reasonable inference could be drawn that any injury causally related to an antitrust violation has been suffered by the plaintiff. Pretermitting the question of whether the acquisition of the Wilcox franchise by LCC might operate so as to restrain trade, this paper chase is nonetheless at an end, since the plaintiff is unable to establish the above stated essential element of its claim.

For the reasons above stated, the defendants' motion for summary judgment should be, and hereby is GRANTED.

of proving the former is satisfied by proof of *some* damage flowing from the antitrust violation.... Satisfying the latter burden is dependent on a showing that the injury was caused by a reduction, rather than an increase, in competition flowing from the defendant's acts, since "[t]he antitrust laws ... were enacted for 'the protection of *competition* not *competitors*,'"... Accordingly, the plaintiff must demonstrate that the defendant's conduct was intended to or did have some anticompetitive effect beyond his own loss of business or the market's loss of a competitor.... Moreover, it is not sufficient for an antitrust plaintiff to allege an indirect ripple effect. As this court wrote in *John Lenore & Co.* [*v. Olympia Brewing Co.*, 550 F.2d 495 (1977)]:

It is not enough to confer standing that plaintiff just prove some injury and show that this injury is within the affected area of the economy. Antitrust violations admittedly create many foreseeable ripples of injury to individuals, but the law has not allowed all of these merely affected by the ripples to sue for treble damages.

550 F.2d at 499. (citations omitted, footnotes omitted).

*Cal. Computer Products v. Intern. Business Machines*, 613 F.2d 727, 732 (9th Cir. 1979). The court went on to state, at p. 735–36:

There are three essential elements to a successful claim of Sec. 2 monopolization:

a) the possession of monopoly power in the relevant market;

b) the willful acquisition or maintenance of that power; and

c) causal "antitrust" injury.

There are four elements to a successful claim of Sec. 2 attempt to monopolize:

a) specific intent to control prices or destroy competition with respect to a part of commerce;

b) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose;

c) a dangerous probability of success; and

d) causal "antitrust" injury.