**BAYOU BOTTLING, INC.,**
**Plaintiff-Appellant,**

v.

**DR PEPPER COMPANY, et al.,**
**Defendants-Appellees.**

No. 82–3516.

United States Court of Appeals,
Fifth Circuit.

Feb. 21, 1984.

Kersten & McKinnon, George P. Kersten, E. Campion Kersten, Milwaukee, Wis., Randy J. Fuerst, Camp, Carmouche, Palmer, Barsh & Hunter, A.J. Gray, III, Lake Charles, La., for plaintiff-appellant.

Woodley, Barnett, Cox, Williams & Fenet, J.L. Cox, Jr., Lake Charles, La., Rain, Harrell, Emery, Young & Doke, Marshall M. Searcy, George C. Lamb, III, Morris Harrell, Dallas, Tex., for Dr Pepper.

Lord, Day & Lord, Gordon B. Spivack, Thomas D. Brislin, Jonathan M. Jacobson (argued), New York City, Stockwell, Sievert, Viccellio, Clements & Shaddock, William E. Shaddock, Bernard H. McLaughlin, Jr., Lake Charles, La., for Coca-Cola of Lake Charles.

Before CLARK, Chief Judge, GOLDBERG and POLITZ, Circuit Judges.

POLITZ, Circuit Judge:

Bayou Bottling, Inc. brought this antitrust action under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and section 7 of the Clayton Act, 15 U.S.C. § 18, against Dr Pepper Company and Coca-Cola Bottling Company of Lake Charles, Louisiana (LCC). Bayou sought treble damages and an order of divestiture under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26. Following the completion of lengthy discovery, the district court granted defendants' motions for summary judgment. 543 F.Supp. 1255. Concluding, as did the district court, that the alleged antitrust violations did not result in antitrust injury, we affirm.

*Facts*

For purposes of the summary judgment only, the defendants stipulated to the accuracy of Bayou's version of many of the dispositive facts, conceded the acquisition antitrust violations charged, but maintained that the violations did not result in a compensable antitrust injury. The facts are set forth in detail in the district court's opinion. 543 F.Supp. at 1257–1261. For the purposes of this appeal, we briefly summarize the relevant facts.

Bayou Bottling, Inc., a Louisiana corporation, is a wholesaler and distributor of soft drinks[1] in and around the cities of Lake Charles and Jennings, Louisiana. Bayou sells a broad range of drinks, most notably Pepsi-Cola and Seven-Up. Bayou does not manufacture the soft drink products it sells. All of its bottled drinks are produced by a wholly-owned subsidiary, and all its canned drinks are produced by a company owned by various Pepsi-Cola bottlers.

Dr Pepper Company, a Colorado corporation, manufactures the concentrate used in the production of Dr Pepper and Sugar Free Dr Pepper. In marketing its product, Dr Pepper utilizes a licensing agreement, or franchise, which authorizes a local bottler to produce and sell its soft drink line in a specified geographic area. The local bottlers determine prices and marketing strategy.

LCC, a Louisiana corporation, is a wholesaler and distributor of soft drinks in Lake Charles and Lafayette. It manufactures and markets several soft drinks, notably including Coca-Cola and, since 1976, Dr Pepper.

The relevant product market is soft drinks and, for purposes of the summary judgment motion, the relevant geographical market is the area of southwest Louisiana encompassed by LCC's Dr Pepper franchise.

In early 1975 there were two Dr Pepper bottlers in southwest Louisiana, Clyde Johnson in Lafayette and Lloyd Wilcox in Lake Charles, both of whom were ready to retire from the business. Donald Antle, the vice-president in charge of franchises for Dr Pepper, encouraged the two men to sell their operations to Coca-Cola bottlers. For business reasons Dr Pepper favored the assignment of its franchises to Coca-Cola dealers. Representatives of Bayou and LCC negotiated with both sellers. Antle's urgings were unsuccessful with respect to the Johnson franchise; he sold to an affiliate of Bayou, a Pepsi-Cola bottler. The franchise assignment was approved by Dr Pepper.

The sale of the Wilcox franchise precipitated the present antitrust action. Allegedly, on April 23, 1975, Wilcox orally agreed to sell his business to Bayou for one million dollars. Their discussions continued on the morning of April 25, 1975, but later in the day, Antle, Wilcox and representatives of LCC executed a written agreement by which Wilcox agreed to sell to LCC for one million dollars. On May 23, 1975, Bayou filed suit in Louisiana state court seeking specific performance of the oral agreement purportedly reached on April 23, 1975. This suit foundered on Louisiana's Statute of Frauds, article 2275 of the Louisiana Civil Code, and was dismissed.

Bayou then brought the present action, charging the defendants with an agreement, combination and conspiracy in restraint of trade in violation of section 1 of the Sherman Act, premised on defendant's interference with Bayou's attempt to acquire the Wilcox bottling operation. Further, Bayou charged defendants with monopolization, attempting to monopolize and combining and conspiring to monopolize in violation of section 2 of the Sherman Act, based on the claim that the Wilcox acquisition gave LCC a monopolistic market power which it exercised in an illegal manner. Finally, Bayou charged defendants with ef-

---

1. For purposes of the summary judgment motion, the parties defined soft drinks as nonalcoholic, nondairy beverages for human consumption, which are manufactured by addition of a flavored extract to water (usually carbonated), and purchased by the retail customer in consumable form, predominantly packaged in bottles or cans but also dispensed in nonpackaged form.

fecting a merger which restrained competition in the soft drink market, in violation of section 7 of the Clayton Act.

The core holding of the district court's grant of summary judgment, as we perceive it, is that Bayou's injuries are not antitrust injuries as that term is defined by *Brunswick Corp. v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). On appeal, the principal issue before us is whether the charged violations of the antitrust laws resulted in any cognizable, compensable antitrust injury to Bayou. We also examine Bayou's allegations of predatory practices.

### Analysis

■ The summary judgment vehicle is to be used sparingly, particularly in complex litigation, but it is available, despite apparent complexity, in a case in which there is no genuine issue of material fact in dispute. Summary judgment may be granted in an appropriate antitrust case. *Southway Theatres, Inc. v. Georgia Theatre Co.,* 672 F.2d 485 (5th Cir.1982). In *Alladin Oil v. Texaco, Inc.,* 603 F.2d 1107, 1111 (5th Cir.1979), we observed:

> simply because a case is based upon the antitrust laws does not suspend the application of Rule 56. The reason summary judgments may seem less common in antitrust cases is because such cases are ripe with issues of motive, intent and credibility which often must be inferred from the total circumstances.

The present case fits the summary judgment mold. The pertinent facts are stipulated or there is otherwise no genuine dispute. The issues presented are purely legal.

■ A plaintiff in a private antitrust action who seeks treble damages under section 4 of the Clayton Act must prove more than the defendant's violation of the antitrust laws. In *Brunswick,* a case involving a violation of section 7 of the Clayton Act, the Supreme Court held that one seeking treble damages must prove that the antitrust violations resulted in antitrust injuries:

> We ... hold that for plaintiffs to recover treble damages on account of [an illegal acquisition], they must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause."

*Id.* 429 U.S. at 489, 97 S.Ct. at 697 (*quoting Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969)). In *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 2550, 73 L.Ed.2d 149 (1982), the Court reiterated that "'[C]ompetitors may be able to prove antitrust injury before they are actually driven from the market and competition is thereby lessened,'" (*quoting Brunswick,* 429 U.S. at 489, n. 14, 97 S.Ct. at 698, n. 14), but the Court did not remove or lessen, as Bayou seems to imply, the essential requirement that a section 4 plaintiff must establish an antitrust injury to competition.

The holding in *Brunswick,* which involved a violation of section 7 of the Clayton Act, has been accorded broader application. In *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.,* 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981), the Court applied *Brunswick* to violations of section 2(a) of the Clayton Act. In *Blue Shield of Virginia v. McCready,* while holding for the plaintiff, the Court clearly indicated that *Brunswick* applied to section 1 of the Sherman Act. *See also Associated General Contractors v. California State Council of Carpenters,* —— U.S. ——, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The Court has not yet extended *Brunswick* to instances involving section 2 of the Sherman Act, but we recently did so in *Multiflex, Inc. v. Samuel Moore & Co.,* 709 F.2d 980 (5th Cir.1983).

■ Bayou complains that the defendants' antitrust violations caused it to suffer a series of antitrust injuries. First, Bayou claims an antitrust injury because it was prevented from acquiring Wilcox's franchise, an acquisition which would have improved its business position and increased its profits. This assertion of antitrust injury is foreclosed by the holding in *Brunswick*. The *Brunswick* case involved a bowling equipment manufacturer which acquired over two hundred bowling centers from defaulting customers. The plaintiffs, operators of competing centers, identified a violation of section 7 of the Clayton Act and sought treble damages under section 4 for the profits they would have made if the defaulting centers had discontinued operations. In holding that the plaintiffs had not suffered an antitrust injury, the Court stated:

> If the acquisitions here were unlawful, it is because they brought a "deep pocket" parent into a market of "pygmies." Yet [plaintiffs'] injury—the loss in income that would have accrued had the acquired centers gone bankrupt—bears no relationship to the size of either the acquiring company or its competitors. [Plaintiffs] would have suffered the identical "loss" —but no compensable injury—had the acquired centers instead obtained refinancing or been purchased by "shallow pocket" parents. . . .

429 U.S. at 487, 97 S.Ct. at 696. For similar reasons, Bayou's failure to acquire the Wilcox franchise does not constitute an antitrust injury. Bayou would have suffered the identical loss of sales, and economies of scale if Wilcox had retained his operation or if he had sold to a third party. The injury does not satisfy either prong of the *Brunswick* test; it is not the type of injury the antitrust laws were designed to prevent and it does not flow from that which ostensibly made the defendants' activities illegal.

■ Bayou's second and third assertions of antitrust injury relate to the defendants' alleged exclusionary conduct with respect to vending machines and shelf space. Bayou complains that LCC does not permit retail outlets to place Bayou's products in vending machines and coolers owned by LCC, and that LCC provides free maintenance service on machines and coolers owned by businesses if the machines and coolers are stocked only with LCC products. Without anything more, these practices are not barred by the antitrust laws. They are competitive acts. It ought to be apparent that "a monopolist's right to compete is not limited to actions undertaken with an altruistic purpose. Even monopolists must be allowed to do as well as they can with their business." *Northeastern Telephone Co. v. American Telephone & Telegraph Co.,* 651 F.2d 76, 93 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982). The shelf space argument also lacks merit. Stores allot shelf space to the bottlers in proportion to market activity. A bottler with a popular product is given a greater portion of available shelf space than a bottler with a product which has less sales appeal. When LCC acquired Wilcox's Dr Pepper operation, it received that product's share of the shelf space.[2] Bayou acknowledges that store owners apportion their shelf space on the basis of sales and that LCC has only that portion consistent with its total share of the soft drink market. But Bayou implies an antitrust injury and suggests an entitlement to more shelf space than its market share would justify. The district court correctly rejected this asserted antitrust injury.

Fourth, Bayou contends that the Wilcox acquisition enabled LCC to subject it to acts of predatory pricing. Specifically, Bayou complains that the defendants engaged in predatory pricing of Coca-Cola and Sprite in 32 ounce returnable bottles. This com-

---

2. For the purpose of the summary judgment motion, the parties stipulated to the following estimation of market shares. Prior to the Wilcox acquisition, LCC had in excess of 45 percent of the soft drink market; Wilcox's Dr Pepper operation had 30 percent; Bayou had 20 percent; and all remaining companies had less than 5 percent of the market. Following the Wilcox acquisition, LCC had in excess of 75 percent while the shares of the other companies remained substantially the same.

plaint does not withstand close scrutiny. Bayou first introduced 32 ounce returnable bottles of Pepsi-Cola and Seven-Up to the Lake Charles area. Bayou marketed these at a fifty cent discount per case and met with success. Later, LCC began marketing 32 ounce returnable bottles of Coca-Cola and Sprite at a one dollar discount per case. Bayou claims it was injured by this alleged predatory pricing.

 One seeking to establish predatory pricing must demonstrate that the defendant "at least sacrificed present revenues for the purpose of driving [the plaintiff] out of the market with the hope of recouping the losses through subsequent higher prices." *International Air Industries v. American Excelsior Co.,* 517 F.2d 714, 723 (5th Cir. 1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976). Generally, in order to prove that the defendant has sacrificed present revenues, it is necessary to establish that the defendant's prices were below marginal or average variable cost.

 Bayou contends that to determine whether LCC priced below the average variable cost threshold, only the 32 ounce bottles should be considered. Both Bayou and LCC are full-line soft drink dealers, selling a variety of drinks in a variety of sizes. We conclude that the determination of the average variable cost in the wholesale soft drink industry, under the facts here presented, must take into consideration the full product line. We agree with our colleagues of the Ninth Circuit who, in a similar context reasoned that:

> ... The pricing of one size at a predatory level would not necessarily drive out rivals who were selling a full line, as is the case in this industry, unless this placed the overall price of the line at the predatory level.

*Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848, 856 (9th Cir.1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978). Bayou has not alleged that LCC's pricing of the 32 ounce bottles of

Coca-Cola and Sprite placed the overall price of LCC's line at the predatory level. Indeed, the record reflects otherwise.[3] Bayou's claims concerning predatory pricing lack merit. Under the facts of this case, a finding of predatory pricing would "chill the very behavior the antitrust laws seek to promote." *Northeastern Telephone Co. v. American Telephone & Telegraph Co.,* 651 F.2d at 88.

In holding that no antitrust injury resulted from the charged acts, we are mindful of the apparent difference in the compensable injury contemplated by sections 1 and 2 of the Sherman Act, particularly with reference to injuries flowing from attempted monopolization. *See Multiflex, Inc. v. Samuel Moore & Co.* Notwithstanding, we are persuaded that no cognizable antitrust injury is present in this case.

### Conclusion

We have considered Bayou's other claims and find them to be without merit. Assuming that the defendants have violated sections 1 and 2 of the Sherman Act and section 7 of the Clayton Act, Bayou has not shown, as it must show under *Brunswick,* that these violations resulted in a compensable antitrust injury. And, as relates to the alleged predatory and exclusionary practices, we perceive neither antitrust violation nor antitrust injury.

The district court's grant of summary judgment is AFFIRMED.

---

**3.** Considering LCC's entire soft drink line, during the years 1974 through 1977 LCC incurred average costs per case of $2.36, $2.79, $2.73, and $2.87, respectively, and received average revenues per case of $2.62, $3.18, $3.23, and $3.30, respectively.