**LOUISA COCA–COLA BOTTLING CO., Plaintiff,**

v.

**PEPSI–COLA METROPOLITAN BOTTLING CO., INC., Defendant.**

**No. CIV. A. 99–114.**

United States District Court, E.D. Kentucky.

June 11, 1999.

Bradley F. Wallace, Louisa, KY, Richard A. Getty, Gregory A. Keyser, Getty, Keyser & Mayo, LLP, Lexington, KY, for Plaintiff.

William P. Emrick, McKenzie, Woolery, Emrick & Webb, P.S.C., Ashland, KY, Richard T. Colman, Edward P. Henneberry, Michael P.A. Cohen, Howrey & Simon, Washington, DC, for Defendant.

### MEMORANDUM OPINION & ORDER

WILHOIT, Chief Judge.

Plaintiff, a soft drink distributor, brought this antitrust action against its chief rival for monopolizing the local soft drink market. Plaintiff accuses the Defendant of unfair trade practices including coercive marketing plans, illegal payoffs, and commercial bribery to obtain an unfair competitive advantage. Defendant denies any wrongdoing and accuses the Plaintiff, in turn, of unfair, anticompetitive conduct as well, including defaming Defendant and abusing the Court system in an effort to stifle legitimate competition.

This matter is currently before the Court on Defendant's motions for (1) summary judgment on each of Plaintiff's claims and (2) partial summary judgment on Counts II and III of Defendant's counterclaims. The parties fully briefed these motions and the Court conducted oral argument on the same. The Court having been sufficiently advised, the motions are now ripe for decision.

## I. Facts

### A. The Parties

Pepsi[1] and Coke[2] both manufacture a variety of beverage syrups and concentrates which they distribute to bottling companies. The bottlers manufacture bottled and canned beverages from the syrups which they sell to retailers for resale to the public. Each bottler has a franchise territory in which it holds exclusive distribution rights for its products.

Pepsi Cola Metropolitan Bottling Co., Inc ("Pepsi–Metro") and the Louisa Coca–Cola Bottling Co. ("Louisa Coke") are bottlers servicing parts of Eastern Kentucky and West Virginia[3]. Pepsi–Metro, one of the world's largest bottlers, is a wholly owned subsidiary of the Pepsi Cola Co. It began distribution in Kentucky and West Virginia after acquiring one of Pepsi's independent bottlers, East Kentucky Beverage Co. ("EKB") in the early 1990's. Louisa Coke, by contrast, is a small, privately-held business owned and operated by Harold Britton ("Britton") which consists of ten employees and services only a seven county area.[4] Coke services the remainder of Kentucky and West Virginia through Coca–Cola Enterprises, Inc. ("CCE"), the largest Coke bottler in the world; Coca–Cola Bottling Co. Consolidated ("Coke Consolidated"), Coke's second largest bottling operation; and Middlesboro Coca–Cola Bottling Works ("Middlesboro Coke"), another small, independent bottler servicing an eight county, tristate rural franchise. Pepsi–Metro's Pepsi franchise territory covers the entire Louisa Coke franchise territory and parts of those serviced by each of these other Coke bottlers. Thus, Pepsi–Metro competes with all of these Coke bottlers, large and small, for business in the Eastern Kentucky/West Virginia market.

### B. Marketing Programs

National and regional retailers are the biggest outlets for Coke and Pepsi products. Many larger grocery and convenience store retailers like SuperAmerica, Kroger, and Winn Dixie have stores in more than one bottler's territory and operate out of multi-state marketing and distribution centers without regard to local bottlers. To provide these larger clients with consistency in distribution, pricing, service, advertising and promotion of soft drink products, Coke and Pepsi implement national and regional marketing programs. They coordinate the displays and advertising and give the retailers certain promotional allowances. They also provide their bottlers with funds for promotions in local stores within the bottler's sale territory. At issue in this case are two promotional tools, Calender Marketing Agreements ("CMAs", also known as Customer Development Agreements or "CDAs" by Pepsi); and "dealer loaders".

#### 1. CMAs

CMAs are written agreements in which the retailer agrees to promote a particular brand on certain weeks and holidays by

---

1. The term "Pepsi", as used in this opinion, shall refer generically to the entire Pepsi Cola Company system including its product bottlers and distributors. Similarly, the term "Coke" shall reference the entire Coca Cola Company system including the bottlers and distributors of Coke products.

2. See note 1, *supra.*

3. Though identified as a bottler, Louisa Coke no longer does any actual bottling. Rather, it simply serves as a distributor. While it holds the exclusive distribution rights for all Coke products in its franchise territory, it does not provide fountain syrup services or carry the complete line of Coke products such as Nestea, Fruitopia and the like. Britton complains that it would not be profitable to provide these other services because of Pepsi's market dominance. Though Britton has not made his ability to market these other services an issue in his case, Pepsi–Metro has raised the matter to suggest that Louisa Coke suffers in its market from its own refusal to compete on a broad scale.

4. Specifically, Louisa Coke's territory covers Lawrence, Johnson, Martin, and Floyd Counties in Kentucky, as well as Wayne, Mingo and Lincoln Counties in West Virginia.

featuring that product in newspaper ads to the exclusion of the competition, providing a certain amount of shelf space and the opportunity to place vending equipment, as well as displaying the product in a certain way or place during the promotional period. The retailer is usually compensated for his performance on a per case basis. Large retailers frequently enter into CMAs with more than one company on an annual basis. Thus, Coke will be the retailer's featured product on some weeks, Pepsi on others. The retailers are free to cancel the agreement at any time and the only penalty for noncompliance is loss of the per case discount.

Coke USA and Pepsi enter into many CMAs with retailers at the national and regional level on behalf of all their bottlers. Similarly, all of the individual Coke and Pepsi bottlers in the Kentucky/West Virginia market area with the exception of Louisa Coke offer CMAs of their own to local retailers. Pepsi, Coke USA and all Coke bottlers other than Louisa Coke agree that CMAs foster competition, drive up volume, improve efficiency and reduce retail prices. Everyone agrees consumer prices would rise if CMAs were eliminated.

Even though a few customers have requested CMAs from Louisa Coke, it refuses to offer such. Britton testified that he refuses to offer the same because he believes they are anticompetitive. Pepsi claims Britton does not want to go to the expense of competing in this fashion or investing in his company's future. To prove its point, Pepsi notes that Britton's warehouses are nearly completely depreciated and he has purchased no new equipment for his operations other than two used trucks. Pepsi further notes that Britton has made a number of interest free loans to himself and his family, abandoned his contracts with the Jenny Wiley State Park System, and refuses to carry the full line of Coke products or any fountain syrups. Britton does not deny these facts but says his decision to abandon fountain syrups and other coke products are attributable to Pepsi's lock on the market. Britton also says he abandoned the Jenny

Wiley account because of a dispute with the park service over a decision to reopen the bidding process.

Whatever Louisa Coke's reasons are for not offering its own CMAs, the fact remains that it does operate under and benefit from the national and regional CMAs negotiated by Coke USA and other bottlers with such large clients as Winn–Dixie, Kroger, Wal–Mart, Food City, SuperAmerica, and Happy Mart, though. Louisa Coke simply reports its case sales to Coke USA who then makes its contractual payments to the retailer's account.

Louisa Coke sells 40% of its volume to customers with national or regional Coke CMAs. Furthermore, every other Coke bottler in this region negotiates CMAs of their own—some of which Louisa Coke benefits from. Louisa Coke insists, however, that the Court should enjoin Pepsi–Metro from offering or participating in the same. It complains that Pepsi–Metro has secured for itself the best advertising, display, shelf and storage space for all of the key marketing weeks and holidays. Louisa Coke says there is no point in providing CMA benefits to retailers in its franchise territory because Pepsi has already taken the most desirable promotional dates. Louisa Coke further complains that the CMAs restrict the shelf space available for Coke products. This causes diminished shelf and storage space which means Coke drivers make more trips to deliver less product. This increases costs and decreases efficiency. Finally, Louisa Coke says it has to offer retailers lower prices than Pepsi in order to keep its products priced competitively by the retailer during the Pepsi promotions. Thus, it sells for less that which it is delivering inefficiently for more. Until the CMAs are eliminated in its territory, Louisa Coke complains it will not be able to compete effectively and that prices will remain artificially low.

### 2. Dealer Loaders

Dealer loaders are sales incentive contests and display programs implemented

through written agreements with the retailers in which the bottlers award prizes to retailers who meet specific performance criteria like increased sales. The retailer is free to accept or reject these promotions. Those who do participate are free to do with the prize as they like. Most raffle them off to customers or employees. Like CMAs, dealer loaders are designed to increase sales volume which leads to lower retail prices. Dealer loaders are commonly offered nationwide by many product manufacturers including those outside the soft drink industry.

As with CMAs, Louisa Coke does not offer dealer loaders but Coke USA and all of the other Coke bottlers servicing the eastern Kentucky region do. For example, Coke USA gave SuperAmerica's racing team $100,000 in exchange for its bottlers' exclusive right to market soft drinks for a one month period, two to one display space over Pepsi during the promotional period, "first position" on displays and cold ice barrel placements; and a lowered promotional margin to consumers. Louisa Coke benefitted from this dealer loader and Coke USA assessed Louisa Coke's proportionate share of the costs against a Louisa Coke marketing account funded by Coke USA. Other Coke USA dealer loaders funded from Louisa Coke's account include golf outings, trips to the beach, World Cup Soccer tickets; Final Four tickets; golf clubs, Disney World passes and NFL tickets. Because of the widespread use of these programs, all of the other regional Coke Bottlers agree that Pepsi–Metro would be placed at a serious competitive disadvantage if enjoined from participating.

Louisa Coke believes that dealer loaders are anticompetitive and that it would be a waste of time trying to compete with such against Pepsi given Pepsi's control over the market. Louisa Coke also believes there is more going on here. It claims Pepsi gives retail managers and employees

gifts "under the table" and without the owners' knowledge in exchange for the best display and shelf space and even the elimination of Coke shelf and storage space. To support this claim, Louisa Coke submitted many affidavits most of which contain either irrelevant information or hearsay. Pepsi vehemently denies making any cash payments and claims any "gifts" it gave were promotional items exchanged pursuant to the written dealer loader incentive plans.

## C. Prior Litigation

This is not Louisa Coke's first antitrust venture. In 1987, it sued Pepsi–Metro's predecessor, EKB, in an antitrust and state law unfair competition case. *Louisa Coca–Cola Bottling Co., v. East Kentucky Beverage Co.*, No. 87–240 (E.D.Ky.). That case challenged, among other things, EKB's use of CMA's, dealer loaders and secret payments. The Court summarily dismissed the CMA issues but permitted Plaintiff's secret payment allegations to proceed. EKB settled the remaining claims before the case went to trial by paying Louisa Coke $400,000.[5]

Before the settlement was finalized on the EKB suit, Britton asked Coke USA to fund another lawsuit against Pepsi.[6] Coke USA declined this request.

In 1992, Britton informed Coke USA that he intended to sue Pepsi–Metro for unfair trade practices. He claimed Pepsi's illegal incentives to store managers "on the take" prevented him from obtaining a fair retail price and display space for his Coke products. Coke USA sent a team to Louisa Coke's territory to investigate these charges. The Coke team surveyed a dozen stores throughout Louisa Coke's territory before finding Britton's accusations unsubstantiated. The team reported to Coke USA its findings that Louisa Coke did not (1) provide its customers with regular merchandising on the weekends; (2)

---

5. Interestingly, Britton put none of that $400,000 into Louisa Coke. Rather, he divided this money amongst his family.

6. A copy of that letter is not in the record but Coke USA's response referencing this letter is.

did not always receive a display for its featured promotions but the retailers indicated this was due to Coke's failure to keep its shelves stocked during the promotion; and (3) though Britton claimed Wal–Mart locked him out of business there, the store manager said he would like to have a Coke CMA but he had not heard from anyone at Coke in more than ten months. Ultimately, the Coke team concluded that Britton's competitive shortcomings were the product of his marketing methods and factors entirely in his control. The team recommended that Britton train his team better to combat his low sales level though this alone would not solve his problems. The team then concluded that Britton was competitive or fairly represented with regard to retail pricing and permanent display space—his two biggest complaints.

## D. Effect of Litigation on Parties

During the EKB case, the parties estimated that EKB had a 70% market share. The parties estimate that Pepsi–Metro's market share is the same as its predecessor. Thus, there has been no change in Pepsi's position whatsoever.

As for Louisa Coke, its business and profits have increased significantly since settling the EKB suit. Its sales volume is up at least 47.5%, gross profits are up 65.58%; and operating income has risen 336.5%. Plaintiff's expert says these increases are lower than that which he would expect in a competitive market, though, and attributes them to Plaintiff's low overhead.

## E. Current Case

Plaintiff's current claims are as follows:

*Counts I & XIII (contracts in restraint of trade):* Pepsi–Metro has entered into contracts which provide certain rebates and discounts to preferred retailers in exchange for promises not to (1) sell Louisa Coke's products at a lower price than Pepsi; (2) offer Louisa Coke equal shelf space; and (3) display Louisa Coke's products. Such contracts constitute an unreasonable restraint on trade in violation of 15 U.S.C. § 1 and W.Va.Code § 47–18–3.

*Counts II & VI (price discrimination):* Pepsi–Metro offers certain preferred retailers special rebates and discounts in an effort to monopolize the market in violation of 15 U.S.C. § 15; KRS 365.020.

*Count III (tying agreements):* Pepsi–Metro denies retailers its Pepsi products unless they also to agree Pepsi's snack foods and other products and also exclude Louisa Coke's products in violation of 15 U.S.C. § 14.

*Count IV & XI (monopolization:)* Pepsi–Metro has an 80% share of the soft drink market in Louisa Coke's territory which makes it a monopoly. It has maintained that monopoly power by (1) purchasing other brands such as 7–UP, Dr. Pepper, etc.; (2) buying certain fast food franchises; (3) entering contracts with retailers that discriminate in price; (4) offering certain select retailers special rebates in exchange for preferential treatment; (5) entering contracts which prohibit retailers from promoting, displaying, or giving equal pricing or shelf space to Louisa Coke's products; and (6) conditioning the sale of Pepsi products on the sale of other products such as snack foods as well. Maintenance of this monopoly through such anticompetitive acts violates 15 U.S.C. § 2 and W.Va.Code 47–18–4.

*Counts V & XII (attempted monopolization):* Pepsi–Metro engaged in anti-competitive conduct for the sole purpose of controlling prices and/or output and/or destroying competition in violation of 15 U.S.C. § 2 and W.Va.Code § 47–18–4.

*Counts VII & X (secret rebates):* Pepsi–Metro offers secret payments, gifts, allowances, rebates, refunds, commissions, discounts and incentive programs to certain retailers and store managers in violation of KRS 365.050 and W.Va.Code § 47–11a–9.

*Count VIII (unlawful acts):* Pepsi–Metro's unfair acts, contracts and monopolies violate KRS 367.170 & 367.175.

*Count IX (commercial bribery):* Pepsi–Metro gives gifts, payments, and the like to retail employees without their employer's consent in order to influence the employee's conduct in ways contrary to the employer's interests. Such conduct violates Kentucky's commercial bribery statute, KRS 518.020.

## II. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure the Court must view the evidence in the light most favorable to the nonmoving party, in this case the Plaintiff. Thus, when examining the record the Court will resolve doubts and construe inferences in favor of the Plaintiff in an effort to determine if any genuine issues of material fact exist. However, in a series of decisions commonly referred to as the "trilogy", *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the U.S. Supreme Court emphasized that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. In short, the "trilogy" requires the nonmoving party to produce specific factual evidence that a genuine issue of material fact exists.

The United States Court of Appeals for the Sixth Circuit has interpreted the "trilogy" to mean that the nonmoving party must produce enough evidence, after having had a reasonable opportunity to conduct discovery, so as to withstand a directed verdict motion. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir.1989). As that Court stated, "the movant could challenge the opposing party to 'put up or shut up' on a critical issue...[and] if the

respondent did not 'put up', summary judgment [is] proper." *Id.* at 1478.

## III. Pepsi–Metro's Motion for Summary Judgment on Plaintiff's Claims

### A. Price Discrimination, Tying Agreements and Unlawful Acts

Plaintiff has stipulated to the dismissal of its price discrimination, tying agreement and unlawful acts claims as set forth in Counts II, III, VI and VIII. of its complaint. Accordingly, the Court shall grant summary judgment to the Defendant on these claims.

### B. Commercial Bribery

Count IX accuses Pepsi–Metro of giving secret payments and gifts to various retail employees without their employers' consent in violation of Kentucky's Commercial Bribery Statute, KRS 518.020. As it pertains to this action, that statute makes it a crime to

> Offer[ ], confer[ ], or agree[ ] to confer any benefit upon any employee ... without the consent of the latter's employer ... with intent to influence his conduct contrary to his employer's ... best interests.

*Id.* Civil remedies for violations of this criminal statute are generally available through KRS 446.070 [7]. *Big Rivers Electric Corp. v. Thorpe,* 921 F.Supp. 460, 462 (W.D.Ky.1996). Plaintiff can only pursue this civil relief, however, if it has standing to assert such a claim. This means Louisa Coke must belong to that class of persons for whose benefit the Kentucky General Assembly passed the commercial bribery statute. *See, State Farm Mutual Automobile Ins. Co. v. Reeder,* 763 S.W.2d 116, 118 (1988); *& Hackney v. Fordson Coal Co.,* 230 Ky. 362, 19 S.W.2d 989, 990 (1929).

In considering the question of Louisa Coke's standing, the Court found the

---

7. KRS 446.040 provides that "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation."

*Hackney* decision very helpful. Hackney was a small retailer who challenged a coal company's decision to pay its employees in scrip redeemable only at company stores. 230 Ky. 362, 19 S.W.2d 989. This decision cost the retailer a great deal of business because any employee redeeming the scrip outside the company store was subject to discharge. *Id.* at 990. The retailer argued that such conduct violated § 2738s1 which made it unlawful for any company to directly or indirectly require employees to purchase items at a company store or to punish employees who shop elsewhere. *Id.* The retailer further argued that it had standing to pursue these violations by the coal company pursuant to § 466, the equivalent of current KRS 466 .070. *Id.* The trial court and appellate court both disagreed. *Id.* These courts noted that § 2738s1 was passed solely to protect employees from being coerced into trading at the employer's commissary where they might be subject to extortion and unfair dealing. *Id.* It did not intend to protect merchants competing with the company stores. *Id.* Thus, the courts concluded that the coal company employees had standing to contest the scrip but an outside retailer clearly did not. *Id.*

Though the *Hackney* decision is seventy years old, the Kentucky Supreme Court has cited it with approval as recently as 1989. *Reeder,* 763 S.W.2d at 118. Applying it to the instant action, this Court can only conclude that Louisa Coke lacks standing to assert a commercial bribery claim in this case. The commercial bribery statute, on its face, seeks to protect employers from the manipulation of their employees in ways contrary to the employer's interests. KRS 518.020(a). Louisa Coke is a business competitor rather than an employer for purposes of this action. The retailers whose employees Pepsi allegedly bribed might have a cause of action but Pepsi's rivals, like those of the coal company stores, do not. Thus, Louisa

Coke, though allegedly injured by Pepsi's conduct, does not have a cause of commercial bribery cause of action under KRS 446 .070 as it falls outside the class of persons the commercial bribery statute was intended to protect.

In rendering this decision, the Court considered but found Judge Coffman's decision in *Big Rivers Electric Corp. v. Thorpe,* 921 F.Supp. 460 (W.D.Ky.1996) inapposite. Judge Coffman permitted utility rate payers to pursue commercial bribery claims against a coal company which entered into fraudulent coal contracts with an electric company who then passed the costs of those contracts on to distribution companies. The distribution companies, in turn, passed them on again to the ultimate utility rate payers in the form of higher utility bills. *Id.* at 462. Though Judge Coffman declined to apply a "direct-purchaser" rule which would have limited KRS 446.070's availability to persons directly injured by the alleged violators, *id.* at 462, she did not address nor was she asked to address whether the General Assembly intended to protect anyone other than employers with its commercial bribery statute—the issue in the instant action. Thus, *Big Rivers* has no application to this Court's conclusion that only employers and principals have standing to civilly pursue such violations under KRS 446.070.

### C. Secret Payments

▉▉▉ Counts VII and X accuse Pepsi–Metro of giving retailers secret payments and gifts in violation of Kentucky and West Virginia's Unfair Trade Practice Acts.[8] These Acts contain virtually identical language and prohibit:

> The secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special ser-

8. Count VII specifically asserts violations of KRS 365.050 and relief for such through KRS 365.070. Count XI alleges that the same conduct also violated W.Va. law though no specific statute is mentioned. Plaintiff demands relief through W.Va.Code 47–11a–9 but is apparently asserting a violation of W.Va.Code § 47–11a–3.

vices or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor, and where such payment or allowance tends to destroy competition, is an unfair trade practice, and no person shall resort to such trade practice.

KRS 365.050; W.Va.Code § 47–11a–3. To succeed on these claims, Plaintiff must demonstrate (1) a secret payment, (2) made to the injury of a competitor, (3) which tends to destroy competition. *Jefferson Ice & Fuel Co. v. Grocers Ice & Cold Storage Co.*, 286 S.W.2d 80, 83 (Ky. 1955). An actual intent to destroy competition does not matter. *Id.*

Defendant insists it made no secret payments. It says it prohibits its personnel from "taking cash to the street" and that this has not occurred to the best of its knowledge. Indeed, Pepsi–Metro obtained affidavits from all but one of the retailers Plaintiff originally identified as receiving illegal payments. Each affiant denied these secret payment allegations. While Pepsi and the retailers agree that "gifts" were exchanged, they state that such only occurred pursuant to formal, written dealer loader incentive plans which the retailers authorized.

■ Plaintiff has little if any evidence to contradict Pepsi–Metro's position. Indeed, Plaintiff's proof of a West Virginia violation is limited to the affidavit of Vernon Adkins.[9] Adkins is the owner of a small family grocery store in West Virginia—the only store originally identified by Plaintiff as receiving cash payments which has not since denied the allegation. Adkins averred that Pepsi personnel offered to buy Coca Cola's shelf space from him on two occasions but that he refused these offers. Adkins admitted that Pepsi continues to provide him with Pepsi products though at a less favorable price.

Though it is a fairly close call, the Court finds this scant evidence does not suffice to defeat summary judgment on Plaintiff's West Virginia Unfair Trade Practice claim. Assuming the offer was made, Adkins refused it. Thus, no secret payment occurred. Furthermore, there is no question that Pepsi continued to provide Adkins with Pepsi products after the offers were refused. Though Adkins does say Pepsi–Metro subsequently canceled his CMA, he does not say when this happened. Louisa Coke infers that Adkins began paying more for Pepsi some undefined time later because he refused this cash offer. Without more information, though, this is a leap that neither this Court nor any reasonable juror could make. This is particularly so here given the overwhelming evidence from every other retailer Plaintiff identified that such secret gifts did not occur.

■ As for a Kentucky violation, Plaintiff's proof is limited to the affidavits of Steven Banks, Lisa Burke, and Peggy Wallace.[10] Banks and Burke are employees of local SuperAmerica stores who claim their district manager, James Mills, received camping equipment and other valuable merchandise from Pepsi. They

9. Plaintiff also presented affidavits from its drivers who claim various retail personnel told them they had received cash payments from Pepsi–Metro. Plaintiff did not produce any affidavits or testimony from these retailers. Those statements, as presented to the Court, are hearsay. Since Fed.R.Civ.P. 56(e) requires that supporting affidavits be based on personal knowledge and set forth facts as would be admissible in evidence, the Court shall not consider these drivers' affidavits to the extent they offer inadmissible hearsay evidence.

10. Plaintiff also presented an affidavit from Junior Curtis, the manager of a Foodland Grocery Store in Louisa, Kentucky, who states that Pepsi paid Foodland a "special fee" for more shelf space. Curtis does not say when this occurred or how he knows this to be true. Contrary to Plaintiff's original allegations, Curtis does not say Pepsi paid him personally anything or that he witnessed such a transaction with anyone else. Indeed, the owner of that same Foodland denies receiving any such fee. Because the Court cannot determine whether Curtis' statements are based on personal knowledge or hearsay, the Court cannot find this statement meets the requirements of Fed.R.Civ.P. 56 either. Consequently, the Court shall not consider the same for purposes of this motion.

also claim that Mills gives Pepsi very favorable treatment. Mills denied any wrongdoing and insists any gifts he received were issued pursuant to an authorized dealer loader program. He further insists his favorable treatment of Pepsi was motivated by legitimate business concerns. Burke and Banks offer no opinion or evidence to contradict this. Thus, the Kentucky claim rests entirely on Peggy Wallace's affidavit.

Wallace claims she and her manager received gifts from the Pepsi driver. Wallace says she told the driver she could not receive such items and that he then began leaving them in her car. Pepsi has provided affidavits indicating that it gave all of the gifts Wallace mentioned pursuant to formal, written dealer loaders with Wallace's employer. Though the Pepsi driver's "covert" conduct in delivering these gifts is suspicious, neither Wallace nor anyone else denies that this is true. More importantly, Wallace does not claim that she or her manager had any authority to effect how her employer treated Coke or Pepsi. Because there is no evidence that any gift to Wallace was likely to destroy competition, Plaintiff's Kentucky Unfair Trade Practice Claim fails as well.

### D. Antitrust Claims

Counts I, IV, V, XI, XII, and XIII accuse Pepsi–Metro of various West Virginia and federal antitrust law violations including monopolization, attempted monopolization, and entering into unlawful contracts in restraint of trade. West Virginia construes its state antitrust laws in conformity with its parallel federal counterparts. *Gray v. Marshall Cty. Bd. of Educ.*, 179 W.Va. 282, 367 S.E.2d 751 (1988); W.Va. Code § 47–18–16. Accordingly, the Court shall consider the state and federal antitrust claims together.

### 1. Antitrust Injury

■ Before Plaintiff can succeed on any antitrust claim, it must first demonstrate an antitrust injury as opposed to a mere economic injury. *Campus Center Discount Den, Inc. v. Miami University*, 1997 WL 271742, 114 F.3d 1186 (6th Cir.1997). Actionable antitrust injury is an injury to competition rather than just competitors. *Valley Prods. Co. v. Landmark*, 128 F.3d 398, 402 (6th Cir.1997). It requires proof " '(1) that the alleged violation tends to reduce competition in some market and (2) that the plaintiff's injury would result from a decrease in that competition rather than from some other consequence of the Defendant's actions.' " *Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86,88 (6th Cir.1989) *quoting* Areeda & Hovenkamp, Antitrust Law ¶ 334.1b at 299 (1988 Supp.). The Court does not believe Plaintiff has met this burden.

■ Plaintiff does not argue that all dealer loaders and CMA programs are anticompetitive. Indeed, there is no evidence to support such a position. These are formal, written programs which retailers are free to accept, reject, or cancel at any time. Pepsi, Coke USA, and every other Coke bottler agree that these programs are valuable, pro-competitive tools which increase sales volume and decrease consumer costs. This position is bolstered by the fact that Plaintiff derives almost half of its sales from these programs in what it describes as a monopolized, locked market. It is further bolstered by the fact that Plaintiff does not seek to enjoin Coke USA or any other bottler from participating in the same. Rather, Plaintiff argues that only Pepsi–Metro should be so enjoined because it already has enough of a market share in Louisa Coke's franchise territory.

Plaintiff's complaint, reduced to its most basic terms, is that it cannot charge more for its products. Louisa Coke claims Pepsi's alleged exclusionary practices have artificially deflated consumer soft drink prices in Louisa Coke's market. Louisa Coke currently competes with Pepsi by cutting its wholesale price. Apparently, Louis Coke cannot raise its wholesale prices and remain competitive under current circumstances. Though Louisa Coke has operated at a significant profit in this

deflated market, it believes it could increase its profit margins even more if Pepsi's current competitive practices were enjoined because it could sell its products at a higher price. There is apparently no question that consumer prices would rise if the Court were to grant the relief Plaintiff seeks.

Though the parties agree that current prices are unusually low, there is no complaint of predatory pricing here. Low prices which remain above predatory levels do not constitute an antitrust injury because they benefit consumers regardless of how they are set. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338, 110 S.Ct. 1884, 1892, 109 L.Ed.2d 333 (1990). The whole purpose behind the antitrust laws is to protect consumer interests. *Id.* That the low prices may be "ruinous" to one or more competitors, then, does not matter. *Id.* at 337 n. 7, 110 S.Ct. 1884. Furthermore, it is not for Courts to decide whether the competition that produces these low prices is good or bad. *Id.* As explained by the Supreme Court,

> [w]hen a firm or even a group of firms adhering to a vertical agreement, lowers prices but maintains them above predatory levels, the business lost by rivals cannot be viewed as an "anticompetitive" consequence of the claimed violation. A firm complaining about the harm it suffers "is really claiming that it [is] unable to raise prices." Blair v. Harrison, Rethinking Antitrust Injury, 42 Vand. L.Rev. 1539, 1554 (1989). This is not antitrust injury; indeed, "cutting prices in order to increase business often is the very essence of competition." *Matsushita, supra,* at 594, 106 S.Ct. at 1359. The antitrust laws were enacted for "the protection of competition, not competitors." Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (emphasis in original). "To hold that the antitrust laws protect competitors from the loss of profits due to [nonpredatory] price competition would, in effect, render illegal

any decision by a firm to cut prices in order to increase market share."
*Id.* at 337–38, 110 S.Ct. 1884.

Plaintiff, of course, insists there is more than low prices at stake here. It claims the low prices are simply a by-product of its inability to obtain adequate shelf, storage and display space—the real injury in this case. Because it has less retail space to work with, Louisa Coke says it is forced to operate inefficiently. Its drivers must make more trips to fill less shelf space which costs more. Thus, Louisa Coke is selling for less that which costs more. Louisa Coke argues that it is entitled to more shelf space under the antitrust laws because such would balance the parties' positions with customers.

Plaintiff offers nothing other than its own projected lost profits to prove that Pepsi's actions have foreclosed a substantial share of the soft drink market. A single competitor's lost profits does not demonstrate a market wide competitive detriment. *Baum Research and Development Co., Inc. v. Hillerich & Bradsby Co., Inc.,* 31 F.Supp.2d 1016, 1021 (E.D.Mich. 1998). Louisa Coke apparently expects the Court to assume that the many fringe brands which control 20% of the market have suffered a similar fate. This is an assumption the Court cannot make. Even if the assumption were made, though, it would not save Plaintiff's case.

There is probably no question that Pepsi's promotions influence retailers to give more space to Pepsi products. When Pepsi gets more space, others will obviously get less. There is no evidence, however, that Pepsi can control the retailers' decisions or has the power to exclude its rivals' products outright. Rather, all of the evidence indicates that the store owners within the Louisa Coke market allot shelf, storage and display space at their sole discretion based on such factors as the market's demand for a product and the supplier's ability to keep such products in stock. Common sense dictates that retailers will give more space to those

products which are more popular with consumers and available for sale. *See, e.g., Bayou Bottling, Inc. v. Dr. Pepper Co.,* 543 F.Supp. 1255 (W.D.La.1982) *aff'd* 725 F.2d 300 (5th Cir.1984). Pepsi's uncontraverted evidence indicates that it is superior within Louisa Coke's territory in both respects. Not only are Pepsi products more popular among consumers, Pepsi presented ample evidence that Louisa Coke has an inadequate service record franchise-wide.[11] Indeed, Coke USA's own investigation confirmed that Louisa Coke was fairly represented among its retailers given its operational shortcomings.

To refute Pepsi's evidence, Louisa Coke offered neither claim nor evidence that Pepsi's allotted shelf space is inconsistent with its market share. Nor did it provide any proof that either it or any other soft drink competitor received less retail shelf space than either market demand or their service history justified. Under these circumstances, this Court has no business in engaging in "affirmative action" among retail outlets by telling retailers to give Coke and Pepsi equal retail space. *Id.* The Court would be protecting a competitor rather than competition if it were to do so. *Id.* Since Louisa Coke has failed to justify its demand for more retail space, it has failed to state an antitrust injury premised upon the same. *See, Bayou Bottling, Inc. v. Dr. Pepper Co.,* 725 F.2d 300, 304 (5th Cir.1984) (suggestion that bottler was entitled to more shelf space than market share justified did not state an antitrust injury).

As a final thought, the Court notes that Louisa Coke's complaint seems to be of too much competition rather than anticompetitive conduct. Louisa Coke does not want to compete as vigorously as its opponents.

Its owner, Harold Britton, simply refuses to compete at that level. Its pessimism that its efforts would be fruitless is no excuse for its refusal to try. *Out Front Productions, Inc. v. Magid,* 748 F.2d 166 (3rd Cir.1984). Rather than rise to the challenges set by its chief rival, it asks the Court to restrain that rival from competing. This is something the Court cannot and will not do. Louisa Coke may indeed be a David facing a Goliath but the law affords it no special favor in meeting its foe in battle. For even monopolists have a right to engage in vigorous competition. *Bayou Bottling, Inc. v. Dr. Pepper Co.,* 725 F.2d 300, 304 (5th Cir.1984). Dominant firms can lawfully try to drive out their inefficient rivals through above cost price cuts even if they intend to raise prices later once the competition is eliminated. *Monahan's Marine, Inc. v. Boston Whaler, Inc.,* 866 F.2d 525, 527 (1st Cir. 1989). The Court can find no antitrust injury in practices that are themselves competitive regardless of whether the practices were enabled by antitrust violations. *Indiana Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1418 (7th Cir.1989); *Bayou Bottling, Inc., v. Dr. Pepper Co.,* 543 F.Supp. 1255,1269 (W.D.La.1982) *aff'd* 725 F.2d 300 (5th Cir. 1984). For all of the foregoing reasons, then, Defendants are therefore entitled to summary judgment on Counts I, IV, V, XI, XII and XIII of Plaintiff's complaint.

### 2. Contracts in restraint of trade

█ Even if Plaintiff had stated an actionable antitrust injury, counts I and XIII would still fail. These claims allege that Pepsi violated 15 U.S.C. § 1 and W.Va.

11. Affidavits from 15 large, important customers indicate that they denied Coke more shelf space because they could not count on having enough Coke products to sell. They say they often ran out of Coke products because Louisa Coke did not keep its shelves fully stocked and was slow to respond, if it responded at all, to their requests for additional products. While Pepsi drivers made deliveries several times a day including weekends, stocked the shelves themselves and set up their own displays and advertising, Louisa Coke only came once or twice a week, often left the products on the floor, and never brought any signs or advertising. At least one customer reported that he ejected a Coke driver from his store because the driver's appearance was "nasty, unpresentable and repulsive to customers". Another customer banned Louisa Coke from its store for some time after a Coke driver punched the manager in the face.

Code § 47–18–3 by entering into unlawful contracts in restraint of trade. Specifically, Plaintiff claims Pepsi–Metro offered certain preferred retailers contracts with "discounts" and "advertising subsidies or rebates" in exchange for the retailers' promises not to sell Louisa Coke's products at prices lower than Pepsi or to advertise, promote, display or offer shelf space for Louisa Coke products.

Louisa Coke's allegations apparently refer to the CMAs. The Court has carefully considered Pepsi's CMAs and finds nothing illicit in them. Just as it found in the challenge to EKB's CMAs, the Court finds Pepsi–Metro's "practices of using calendar marketing agreements and discounting to obtain secondary displays would appear to be similar to the practices upheld in other cases." *Louisa Coca–Cola Bottling Co. v. East Kentucky Beverage Co., Inc.*, Lex. Civ. No. 87–240, Memorandum Opinion & Order of April 19, 1999 at P.11; *AAA Liquors, Inc. v. Joseph E. Seagram & Sons*, 705 F.2d 1203, 1206 (10th Cir.1982), *cert. denied*, 461 U.S. 919, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983); *& Beverage Management Inc. v. Coca–Cola Bottling Corp.*, 653 F. Supp. 1144, 1146 (S.D.Ohio 1986).

As an additional problem with Plaintiff's case, Plaintiff failed to show that Pepsi–Metro's use of CMAs "foreclose[s] competition in a substantial share of the line of commerce affected", *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), as assessed under a "rule of reason". *Omega Environmental, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir.1997), *cert denied*, 525 U.S. 812, 119 S.Ct. 46, 142 L.Ed.2d 36 (1998). Retailers are free to accept or reject Pepsi-metro's CMAs, can enter into more than one, and will suffer only a loss of the discount if they opt not to comply. The CMAs typically last one year or less and can be terminated any time by either party. Their short duration and easy terminability substantially negate their potential for foreclosing competition. *Id.* While Louisa Coke complains that Pepsi's CMAs have secured the best promotional opportunities, it presumably need offer only a more attractive CMA package to get the retailer to terminate Pepsi–Metro's CMA in favor of a Coke CMA. *See, Omega*, 127 F.3d at 1164. The fact that it does not want to offer such packages is of no concern to the Court. The Court would be hard pressed to find Louisa Coke foreclosed from the market when it can still reach the ultimate consumers by "employing existing or potential alternative channels of distribution" if it so chose. *Id.* at 1163.

Finally, the Court cannot find market closure when "fringe" brands like "Ale–8–One", "Jolt Cola", and "7–UP", which presumably lack the backing of a worldwide conglomerate of Coke USA's or Pepsi's magnitude, can still capture a combined 23% market share. Furthermore, other, stronger Coke bottlers are apparently waiting on the sidelines should Louisa Coke fold. Louisa Coke, a single competitor, may face market foreclosure in its territory but there is no evidence that competition as a whole or even coke products, themselves, risk elimination from the Louisa Coke franchise territory. Without such evidence, Plaintiff's claims fail.

### IV. Pepsi–Metro's Counterclaims

Pepsi–Metro also seeks partial summary judgment on Counts II and III of its counterclaims. These counts accuse Louisa Coke of defaming Pepsi–Metro and filing frivolous lawsuits in attempt to stifle competition. Louisa Coke, of course, insists the allegedly defamatory statements it made were true and that its litigation efforts have been legitimate even if unsuccessful. The Court finds there are genuine issues of material fact with respect to each claim. Accordingly, Defendant's motion for summary judgment shall be overruled.

In passing, the Court notes it's skepticism that Pepsi–Metro is pursuing a legitimate grievance through its counterclaims. The Court believes these counterclaims are just "fluff" filed in retaliation for Louisa Coke's lawsuit. Nevertheless, the Court is not in a position to resolve these

counterclaims at this point. Their merit is something a jury will have to decide.

## V. Conclusion

For all of the foregoing reasons, IT IS **HEREBY ORDERED AND ADJUDGED:**

(1) that Defendant's motion for summary judgment on Plaintiff's claims is **GRANTED;**

(2) that Defendant's motion for partial summary judgment on Counts II and III of its counterclaims is **DENIED;**

(3) that Plaintiff's complaint is **DISMISSED WITH PREJUDICE;** and

(4) that Defendant's counterclaims shall come on for trial on Tuesday, **SEPTEMBER 7, 1999,** at 9:00 a.m. in **COURTROOM A** at the U.S. Courthouse, **ASHLAND, KENTUCKY.**